418 F.3d 379
In re PEC SOLUTIONS, INCORPORATED SECURITIES LITIGATIONMatthew J. Ganey; Michael Ganz; Steven Riesselman; Patrick Sweeney, Plaintiffs-Appellants, andJason Adelman, Individually and on behalf of all others similarly situated; John L. Walters, On behalf of himself and all others similarly situated; Barrett Windish, On behalf of himself and all others similarly situated; Ray Janisch, Individually and on behalf of all others similarly situated; Diane A. Lindell, Individually and on behalf of all others similarly situated; Stephen Govenar, Individually and on behalf of all others similarly situated; Ernest Gottdiener, Individually and on behalf of all others similarly situated, Plaintiffs,v.PEC Solutions, Incorporated; Paul Rice; Stuart Lloyd; David Karlgaard; Alan H. Harbitter, Defendants-Appellees, andChristos Bratiotis, Defendant.
No. 04-1257.
United States Court of Appeals, Fourth Circuit.
Argued December 2, 2004.
Decided March 18, 2005.

COPYRIGHT MATERIAL OMITTED ARGUED: Samuel Howard Rudman, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P., Melville, New York, for Appellants. Lyle Roberts, Wilson, Sonsini, Goodrich & Rosati, Reston, Virginia, for Appellees. ON BRIEF: Donald J. Enright, Finkelstein, Thompson & Loughran, Washington, D.C.; Gregory M. Nespole, David L. Wales, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, New York; David A. Rosenfeld, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P., Melville, New York; Gregory M. Castaldo, Schiffrin & Barroway, L.L.P., Bala Cynwyd, Pennsylvania, for Appellants. Bruce G. Vanyo, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California; Nicholas I. Porritt, Gregory A. Harris, Wilson, Sonsini, Goodrich & Rosati, Reston, Virginia, for Appellees.
Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.
Affirmed by published opinion. Judge GREGORY wrote the opinion, in which Judge WIDENER and Judge NIEMEYER joined.
GREGORY, Circuit Judge.

1
In the wake of the terrorist attacks of September 11, 2001, the Transportation Security Administration ("TSA") was charged with securing the nation's 429 commercial airports. In early 2002, TSA contracted with Pearson Government Solutions, Inc. ("Pearson") to recruit, evaluate, and hire a federal security workforce to screen air travel passengers. Pearson, in turn, hired a number of subcontractors. It delegated to PEC Solutions, Inc. ("PEC") the task of electronically capturing and transferring to the appropriate authorities the applicants' fingerprints and biographical information. The Pearson subcontract was significant to PEC: it generated $23.7 million, or thirteen percent of PEC's Fiscal Year 2002 revenues, making it PEC's second-largest contract at the time. PEC's work on the Pearson subcontract was largely finished by September 30, 2002.

2
The administration of the TSA-Pearson contract became of concern to the government; originally priced at $104 million, it somehow ballooned to over $700 million. The reason for the increase is disputed,1 but it is clear that at some point TSA audited Pearson and, as a result, Pearson ultimately lost the contract.

3
A class of persons who bought PEC stock between October 23, 2002 and March 14, 2003 ("Appellants" or "the class") allege that PEC, along with David Karlgaard, Paul Rice, Stuart Lloyd, and Alan Harbitter, all officers and directors of PEC ("Individual Appellees," collectively with PEC, "Appellees"), fraudulently failed to disclose material information about the Pearson subcontract in violation of Sections 10(b) and 20(a) of the Securities and Exchange Commission Act of 1934 and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The district court dismissed the suit on the Appellee's Fed.R.Civ.P. 12(b)(6) motion. For the following reasons, we affirm.

I.

4
The claim of the class centers around public statements Appellees made on October 22, 2002, November 14, 2002, and February 21, 2003. We review the statements in this order, assuming Appellants' pleadings as true.

A. October 2002 Statements

5
After trading ended on October 22, 2002, PEC issued a press release announcing its results for the third quarter of 2002 (ending September 30, 2002) and held a conference call. PEC reported earnings of $0.25 per share, exceeding analysts' estimates of $0.17. Appellee Lloyd, PEC's Chief Financial Officer:

6
• predicted that PEC's revenues would grow to between $50 and $52 million in the fourth quarter of 2002, and between $240 and $260 million in fiscal year 2003, which constituted a 30-40% increase over the current year. J.A. 53.

7
• announced that PEC's "DSOs [Day Sales Outstanding] for the quarter were 88 days, down from the last quarter's 91 days." Id. at 55.

8
Appellee Rice, PEC's Chief Operating Officer, noted that: • "PEC experienced significant acceleration in certain engagements related to the federal government's homeland security mission," id.;

9
• "significant incremental orders were received for PEC's transportable automated fingerprint capture and biometric identification (called PACIS)[,]" id. at 54; and

10
• Congress had not yet approved the Department of Homeland Security bill but stated that he did not expect PEC to be affected negatively by this governmental environment. Id. at 55.

11
• PEC's "pipeline," or future business demand, was estimated at $60 million ("unfactored") and $53 million ("factored") for the fourth quarter of 2002 and $317 million ("unfactored") and $190 million ("factored") for the full year 2003. Id. at 56.

12
Appellee Karlgaard, PEC's Chief Executive Officer, recited favorable financial information including that:

13
• "this was truly an exceptional quarter ... partly because of quick response orders for mobile biometric solutions relating to homeland security[,]" id.;

14
• PEC's year-to-year net income increased by nearly 100 percent, id. at 56-57;

15
• this growth positioned PEC to meet its revenue objectives for the year and increase future earnings guidance, id.; and

16
• PEC experienced "solid fundamental performance throughout our company." Id. at 56.

17
These were not the only relevant statements made by Appellees. At the beginning of the conference call John McNeilly, PEC's Manager of Media and Investor Relations, warned that,

18
we may make forward-looking statements that involve risks and uncertainties. These risks and uncertainties could cause PEC Solutions' results to differ materially from management's current expectations and adversely affect the financial condition of the Company.

19
J.A. 244. PEC's 2001 10-K annual report (dated March 29, 2002), which McNeilly incorporated by reference, see id. at 244, included a long list of risk factors written in plain English. See id. at 282-89. Included in this discussion were the facts that any weakened relationships with the federal government or prime contractors could harm PEC's business, Id. at 282, 284, and that PEC's revenues could be negatively affected by government contract audits, which were routine. Id. at 286. Additionally, an unidentified company representative also specifically hedged predictions for future revenues based on the Pearson subcontract, explaining that, because the contract was largely complete, "we have to start speculating more as we talk about the future and what other elements of it they're going to engage us on." Id. at 263. The next day PEC's stock price rose to $31.11 from $26.83 per share.

B. November 2002 Statements

20
PEC filed its form 10-Q for the third quarter of 2002 on November 14, 2002. The report reiterated the Company's earnings as released on October 22, noted that "[p]ayments to the Company on contracts with agencies and departments of the U.S. Government are subject to adjustment upon audit by the U.S. Government[,]" J.A. 58. It also stated that "management believes the effect of audit adjustments, if any, on periods not yet audited, will not have a material effect on the financial statements." Id. The report explained, inter alia, that, "[i]n the opinion of management, all adjustments consisting of normally recurring accruals, considered necessary for a fair presentation, have been included." Id.

C. February 2003 Statements

21
On February 11, 2003, PEC announced its results for the fourth quarter and fiscal year 2002 through a press release and a conference call. Appellee Karlgaard stated that 2002 was "a record year in growth and profitability for the company" and that PEC "has grown at a 5-year compound annual growth rate of 45 percent for revenue and 50 percent for net income. We think these numbers demonstrate a strong, consistent record of performance...." J.A. 59. Annual earnings-per-share were announced at 20 cents, which was at the top of the predicted range of 18 to 20 cents, and total fiscal year 2002 revenues were $48.3 million, just missing the projected range of $50 to $52 million. Id. Appellee Lloyd slightly lowered PEC's guidance for fiscal year 2003's annual revenue from $240-260 million to $240-255 million, which still constituted a 30-40% rate of growth in revenue. Id. at 60.

22
PEC also stated that there was a "temporary discontinuity" in the Pearson subcontract.2 Id. Appellee Rice noted that:

23
• the contract was largely completed and that PEC's revenue shortfall was "largely related to [our] biometrics program and sort of spinning one phase of that effort down and not spinning up the next phase of that effort in the manner that we expected." Id.

24
• PEC believed its homeland security and public safety technology assistance programs had a "strong possibility of contributing substantial sort of [sic] growth revenue" and could "ramp quickly." Id. at 60.

25
• PEC was adversely affected by the delay in passing the 2003 federal budget, but that "we're being pretty conservative with our expectations regarding the budget." Id.

26
An unidentified PEC representative also said that the first phase of the biometrics contract was largely complete and that the contract's "continuing resolution" was the "fundamental reason it's not spinning up as quickly as we anticipated." Id. at 354. PEC's stock fell to $18.48 from $28.80 on heavy trading the next day.

D. March 2003 Statements

27
Finally, for our purposes, PEC issued a press release on March 14, 2003. In it, Appellee Lloyd again revised PEC's financial projections downward for both the first quarter (from $48-49 million to $43-44 million) and the full fiscal year 2003 (from $240-250 million to $200-220 million). This downshift was owed to "anticipated delays in new government awards stemming from the unusually late passing of the 2003 Federal civilian agency budgets" as well as "a discontinuity in certain engagements related to application of biometric identification technologies" that "extended longer than previously expected." J.A. 63. The release then attributed to Appellee Karlgaard the statement that:

28
We have considerable new business in our pipeline, but at this time we are unsure of the timing of several new activities. We have maintained staff availability relating to key anticipated programs in order to be able to immediately mobilize to near-term requirements, and expect a strong second half of the year as the Government moves to implement new programs funded by the recently released 2003 appropriations.

29
Id. at 64. Another immediate decline in PEC's stock price followed, this time from $15.80 per share to $9.81 per share.

E. The Lawsuit

30
Within days, seven lawsuits were filed against PEC. The suits were consolidated into one class-action lawsuit on June 13, 2003 and the class-action complaint ("CAC") was filed on July 24, 2003. Boiled down to its essence, the CAC contends that PEC misled investors by making favorable statements about the company and the Pearson subcontract while not disclosing (1) that "Pearson was being investigated and audited in connection with a government review of the TSA contract and that PEC Solutions, as a subcontractor on that contract, was also being audited ..." J.A. 54 and (2) that TSA stopped paying Pearson and, in turn, that Pearson stopped paying PEC "by no later than August through October 2002." Id. The CAC alleges that because of these two alleged omissions,

31
• PEC's earnings guidance were artificially inflated,

32
• the Appellees' positive statements about the biometrics (Pearson) contract and the financial health of the company were materially misleading,

33
• the financial reports violated Generally Accepted Accounting Procedures ("GAAP") because they failed "to maintain a proper reserve for uncollectible receivables[,]" id. at 55; and failed "to disclose the contingent liabilities and risks and uncertainties associated with the Pearson subcontract." Id. at 59, see also id. at 64-65.

34
Moreover, the CAC asserts that the Individual Appellees all sold stock during the class period "while in the possession of material nonpublic information concerning the Pearson Subcontract and the problems with that contract," id. at 52, and that this helps establish Appellees' scienter. Id. at 64-69.

35
On September 8, 2003, Appellees moved to dismiss the CAC. The district court granted the motion, finding that Appellees' statements were protected forward-looking statements, and that the CAC failed to plead with particularity facts establishing falsity and scienter. Appellants sought to amend the CAC, but the district court denied the motion to amend as futile. This appeal followed.

II.

36
To establish liability under Section 10(b) of the Exchange Act3 and S.E.C. Rule 10b-54 "a plaintiff must prove: (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 208 (4th Cir.1994).5 A fact is material "if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." Longman v. Food Lion, Inc., 197 F.3d 675, 683 (4th Cir.1999), cert. denied, 529 U.S. 1067, 120 S.Ct. 1672, 146 L.Ed.2d 482 (2000) (citations omitted). Scienter may be proven by either intentional misconduct or recklessness, but not mere negligence. See Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338, 343-44 (4th Cir.2003). To establish reliance under a "fraud on the market" theory, as Appellants do here, a plaintiff needs only to show the means of dissemination and the materiality of the misrepresentation, not "direct" reliance. Basic, Inc. v. Levinson, 485 U.S. 224, 243-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Finally, to show loss causation, a securities-fraud plaintiff must demonstrate that the "defendant's misrepresentation was a substantial cause of the loss by showing a direct or proximate relationship between the loss and the misrepresentation." Miller v. Asensio & Co., 364 F.3d 223, 232 (4th Cir.2004) (citations omitted).

37
While on a motion to dismiss we assume all the well-pled allegations of plaintiffs as true and draw reasonable inferences in their favor, Chisolm v. TranSouth Fin. Corp., 95 F.3d 331, 334 (4th Cir.1996), to survive a motion to dismiss, private securities fraud actions must clear the hurdle of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4(b); cf. Phillips v. LCI Int'l Inc., 190 F.3d 609, 620-22 (4th Cir.1999). The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Most significantly for this lawsuit, under the PSLRA the complaint must "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." Id. § 78u-4(b)(2) (emphasis added); see Ottmann, 353 F.3d at 344-45 (in deciding whether a complaint pleads sufficient facts to establish a strong inference of scienter under the PSLRA courts should not focus on specific categories of facts, but rather should utilize "a flexible, case-specific analysis"). If the complaint is insufficient for either of the above reasons, on the motion of a defendant the court "shall" dismiss the complaint. Id. § 78u-4(b)(3).

III.

38
We review dismissals under Fed.R.Civ.P. 12(b)(6) de novo, Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993), but denial of leave to amend a complaint for abuse of discretion. Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir.1999). We hold that the district court correctly held that the CAC fails to satisfy the PSLRA's pleading requirements and did not abuse its discretion by denying Appellants' motion for leave to amend.

A.

39
Appellants' theory of the case is that all the Appellees' positive statements are misleading because Appellees knew, but failed to disclose, that: (1) the government was auditing Pearson and PEC for gratuitous overbilling and, as a result, (2) Pearson withheld payment to PEC. The CAC fails the PSLRA's two-pronged test, however, because it never "state[s] with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).6

40
The CAC relies on the June 3, 2003 congressional testimony of Pearson's President and CEO, Mac Curtis, that some of Pearson's subcontractors were audited by the government "`starting in August-September [2002] time frame, but I don't have specifics of—'" J.A. 48 (interrupted ending in complaint). The CAC also quotes the February 5, 2003 congressional testimony of Kenneth M. Mead, Inspector General of the Department of Transportation, for the proposition that "`TSA review of an [sic] NCS Pearson subcontractor with $18 million in expenses determined that between $6 million and $9 million of these expenses appear to be attributed to wasteful and abusive spending practices.'" Id. at 49. The CAC also makes other allegations about the Pearson contract's substantial cost overruns, none of which much help in establishing a strong inference of scienter.

41
The inference Appellants would have us draw from all this is that PEC was one of the audited subcontractors and that Appellees knew the audit was going badly when making their statements. But such an inference is not a reasonable one on these sparse facts. Neither the statement of Mr. Curtis nor Inspector Mead ever named PEC nor does the CAC provide any further facts which establish that PEC was the subject of an audit, that the audit was non-routine, and that Appellees knew the results of the audit at any relevant time. Indeed, Inspector Mead's statement actually states that the initial audit of Pearson did not take place until October 2002.7 Thus, aside from being vague and conclusory, these statements are internally contradictory: it is less than reasonable to infer that Pearson stopped payment in August or September 2002 based on a TSA audit that, according to the TSA's Inspector General's written statement, had not yet occurred. Rather than establish a strong inference of scienter, this all leaves in doubt whether the Appellees ever had any knowledge of any non-routine audit.

42
A non-payment allegation is likely more material than an audit alone because Pearson's non-payment could signal not only that an audit occurred, but that the audit's outcome was bad, that PEC would lose revenue, and that a key relationship with a prime contractor (and/or the government) was potentially damaged. But the CAC leads to no strong inference that Appellees knew of any such non-payment at the time their statements were made. Rather, with the exception of confidential witnesses "CW-1" (not a director or officer of PEC) who left PEC in October 2002 but "was advised"—the passive voice is notable— "that Pearson ceased paying PEC Solutions," see, e.g., J.A. 50, it offers only improperly generalized allegations that Pearson "had stopped paying PEC" "[a]s a result" of the audit.8

43
Notably, Pearson did pay PEC a substantial amount of the subcontract during the class period. Even granting that such payment was late,9 slow payment is not non-payment. By reading the CAC alone, one learns from PEC's 2002 Form 10-K that Pearson paid $10 million of the $15.6 million remaining to be paid in early 2003 and that by February PEC was "in discussions" to collect the remainder. J.A. 66. Thus, even if Pearson had not fully paid during the October and November statements by PEC, the $10 million payment supports that PEC's expectation of payment was reasonable both before and after early 2003. These facts leave us not with a strong inference of PEC's expectation of Pearson's non-payment; rather, they are equally consistent with PEC's expectation of payment.

44
Appellants also allege that Appellees violated GAAP by not reporting a charge to income (in the form of a reserve against accounts receivable) when it was "probable (e.g., a likely chance) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated." J.A. 65 (citing SFAS No. 5, ¶ 8; see J.A. 402). "As a rule, `general allegations of GAAP and GAAS violations fail to satisfy the scienter requirements of Section 10(b) and Rule 10b-5. The mere misapplication of accounting principles by an independent auditor does not establish scienter.'" In re MicroStrategy, Inc. Sec. Litig. 115 F.Supp.2d 620, 651 (E.D.Va.2000) (quoting Zucker v. Sasaki, 963 F.Supp. 301, 307 (S.D.N.Y.1997)). However, under this Circuit's flexible, case-by-case analysis of scienter, see Ottmann, 353 F.3d at 344-45, it is certainly possible that some egregious GAAP violations may help support an inference of scienter for pleading purposes. See id. ("a plaintiff must also allege facts tending to show that ... `no reasonable accountant would have made the same decisions if confronted with the same facts.' ... In other words ... a plaintiff must allege other facts indicating that the nature of those violations was such that scienter is properly inferred.") (citation omitted).

45
But this alleged GAAP violation adds nothing new; rather, it simply rides around in circles on the inadequate coattails of the scienter pleading. For if PEC was to take a reserve only when it believed nonpayment was "probable" (defined by SFAS 5.03 as when a future event is "likely to occur," see J.A. 401 (emphasis added)) and that "the amount of loss can be reasonably estimated," J.A. 403, we are brought back to Appellants' previous problem that they have not pled facts that give rise to a strong inference that PEC ever believed it would not get paid by Pearson while making the public statements that the CAC challenges.

46
Finally, Appellants argue that the Individual Appellees' sales of PEC stock during the class period establish scienter. We disagree. While insider trading may also support an inference of scienter by revealing a motive and opportunity for profiting from the fraud, it only will do so if the timing and amount of the sale(s) are "unusual or suspicious." In re MicroStrategy, Inc. Sec. Litig., 115 F.Supp.2d 620, 643 (E.D.Va.2000) (citing Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir.1999)). But the CAC pleads no facts establishing that these sales were unusual or suspicious. Indeed, in context, it seems that they were nearly de minimis: Appellees Karlgaard, Rice, Harbitter and Lloyd sold, respectively, 1.17%, 1.47%, 1.79%, and 13.0% of their holdings of PEC stock during the class period. J.A. 109-110, 426.10 This is insufficient to raise a strong inference of scienter under the PSLRA. Cf. MicroStrategy, 115 F.Supp.2d at 644-46. Further, the Individual Appellants actually exercised—but did not sell—stock options during the class period. Finally, Appellees note that the Individual Appellees actually lost over $471 million dollars in collective stock value during the class period. J.A. 110. If this all gives rise to a "strong inference" of anything, it is that no scienter exists. See, e.g., In re First Union Corp. Sec. Litig., 128 F.Supp.2d 871, 898 (W.D.N.C.2001) (CEO and other key corporate officer's sale of less than 5% of total holdings while actually increasing stock amount of stock owned by exercising options was "such a trivial amount of trading" that it "affirmatively demonstrates the absence of scienter."). In sum, the CAC does not plead facts raising a strong inference that Appellees acted with fraudulent intent when making the public statements cited in the CAC.

B.

47
Appellants also challenge the district court's denial of their motion for leave to amend the CAC and wish to submit new information. They proposed to make two amendments to the CAC. First, Appellants asserted that PEC's Form 10-Q for the quarter ending September 30, 2003 notes that, as of September 30, 2002, PEC had an outstanding account receivable of $14.4 million on the Pearson subcontract, and that this was 80% of what it had billed by that time. The suggestion is that this shows that Pearson had "largely stopped paying PEC" by this time because of a governmental audit of PEC that revealed overbilling. Second, they sought to add an allegation from Pearson's answer to PEC's lawsuit against Pearson in the District of Minnesota, in which Pearson claims that it withheld money from PEC because the government had challenged $6-9 million of PEC's billings.

48
Appellants contend that these amendments, when added to the other allegations, cure any scienter problems. They do not. The mere existence of an accounts receivable balance does not indicate that PEC could not reasonably expect payment. Likewise, the proposed amendments still fail to adequately address when any audit was completed or anyone withheld payment. This all leaves less than a "strong inference" of scienter in our minds. Leave to amend need not be given when amendment would be futile. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Davis v. Piper Aircraft Corp., 615 F.2d 606, 613-14 (4th Cir.1980). The district court held that leave to amend would be futile "for the reasons stated above [in the opinion]." J.A. 940-41. As we have held, "As long as a district court's reasons for denying leave to amend are apparent, its failure to articulate those reasons does not amount to an abuse of discretion." Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir.1999). Therefore, the district court did not abuse its discretion.11

IV.

49
For the foregoing reasons, the Appellants fail to state a claim upon which relief may be granted. Thus, the district court's decision to dismiss the case and deny leave to amend is

50

AFFIRMED.

Notes:

1
Appellees note that the contract called for hiring 30,000 screeners, but "rapidly expanded to encompass qualifying, in less than a year, over 120,000 applicants for employment..." Appellees' Br. at 1. Appellants claim that the price increase was a result of mismanagement and wasteful billing practices

2
The Pearson contract was not referred to by name at the time because PEC evidently was contractually obligated not to discuss the details of the deal

3
Section 10(b) provides that
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange—(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j (2000).

4
Rule 10b-5, promulgated under Section 10(b), states that:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17
C.F.R. § 240.10b-5 (2005)

5
Joint and several control-person liability cannot exist under Section 20(a), 15 U.S.C. § 78t(a), unless facts exist to support securities fraud for the controlled entity (here, PEC) under Section 10(b) or Rule 10b-5See Longman, 197 F.3d at 686.

6
This reason for dismissal is sufficient but not necessarily exclusive. Some of Appellees' challenged statements are simply true (even fully granting Appellants' allegations), some would not create a duty to disclose the alleged issues, and others are probably protected by the PSLRA's forward-looking statement safe harborSee 15 U.S.C. § 78u-5(c)(1)(A)(i). Since the complaint's failure to meet the PSLRA's heightened scienter-pleading requirement kills the whole claim, however, we rely on this alone and refrain from full statement-by-statement analysis.

7
Inspector Mead's testimony was precisely this: "By September 2002 TSA was concerned by the rising cost of the contract, andin October 2002, it initiated a preliminary review of NCS Pearson's financial management of subcontractor expenses." J.A. 338 (emphasis added). We note here that we are not strictly limited to the four corners of the complaint when examining this complaint: since it relies upon a public document a court may as well without converting the motion to dismiss into a motion for summary judgment. See, e.g., Greenhouse v. MCG Capital Corp., 392 F.3d 650, 655 n. 1 (4th Cir.2004); Ganino v. Citizens Utils. Co., 228 F.3d 154, 167 n. 8 (2d Cir.2000); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997). Because the CAC relied on Mead's public testimony it is proper to consider the full text of the testimony.

8
A second confidential witness, called "CW-2," is mentioned, J.A. 52, but also does not help establish scienter

9
Understandably, given the confidentiality of the contract, the CAC notes nothing about the deal's payment terms. Yet this leaves the CAC's readers to guess at whether, and if so how, the contract was breached and whether, if breached, Pearson assured PEC that payment would be forthcoming

10
The percentages are derived from the CAC and documents publicly filed by each Appellee with the SEC, of which this court can take judicial noticeSee supra n. 7.

11
Finally, two days before oral argument, Appellants filed a "Motion for the Court to Take Judicial Notice" of a November 4, 2004 order from PEC's lawsuit against Pearson for unpaid funds,PEC Solutions, Inc. v. NCS Pearson, Inc., Civil No. 03-5214 (DSD/JSM) (D.Minn.). It is not at all clear that this motion is proper under any Federal Rule of Appellate Procedure. But, to the extent that we look to it at all, it only confirms our conclusion that Appellants fail to establish a strong inference of scienter. The order states, in pertinent part:
• "The parties agree that [Pearson] paid all PEC invoices through July 3, 2002. However, since August 2002, [Pearson] has failed to pay over $6.3 million in PEC invoices. In all, [Pearson] has paid PEC $18.1 million for invoices totaling over $24.4 million. [Pearson] never rejected any PEC invoices." Id. at slip op. 4 (emphasis added).
• It was not until December 2003 that Pearson formally submitted the invoices for PEC's costs to the TSA and TSA formally rejected those invoices. Id. at 7.
• Pearson submitted rebuttal to TSA's finding that costs attributable to PEC were unjustified. See Id. at 6.
• "On February 13, 2003, TSA informally told [Pearson] that the subcontractor referred to in the congressional testimony was PEC. [Pearson] subsequently informed PEC about TSA's informal position that PEC's costs may be excessive." Id. at 4 (emphasis added).
• Not until June 2003 did TSA send Pearson a report detailing TSA's concerns about costs incurred on the PEC subcontract. Id. at 4.
Thus, according to this court, Pearson has paid 75% of PEC's invoices and apparently did not know of the results of the audit until Feb. 13, 2003, two days after the last actionable statement by Appellants. It then did not relay this to PEC until sometime later.