In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2429

DAVID FANNON and IRON WORKERS
OF WESTERN PENNSYLVANIA PENSION
PLAN,

*Plaintiffs-Appellants*,

*v.*

GUIDANT CORPORATION, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-cv-1658-SEB-WTL—**Sarah Evans Barker**, *Judge*.

ARGUED JANUARY 16, 2009—DECIDED OCTOBER 21, 2009

Before BAUER, FLAUM and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge*. This case involves the claims of a plaintiff class that believes the defendant corporation defrauded them. The class asserts that the corporation knew that it had flawed products, but in the face of that knowledge made false or misleading public statements about the products and about a pending merger. In addition, the plaintiffs charge, the individual defendants sold

nearly $89 million in company stock during the period covered by the class's allegations. The district court dismissed the case on the pleadings with prejudice, concluding that the class complaint failed to raise the strong inference of scienter required by the Private Securities Litigation Reform Act ("PSLRA") and Rule 9 of the Federal Rules of Civil Procedure. The court also rejected the plaintiffs' motion under FED. R. CIV. P. 59(e) to reconsider based on newly discovered evidence, and their related motion under FED. R. CIV. P. 15(a) to amend their complaint.

On appeal, the plaintiffs have limited themselves to three principal arguments: first, that the district court abused its discretion by immediately dismissing their first consolidated complaint *with* prejudice (rather than without prejudice, so that the plaintiffs could try again to submit a legally sufficient pleading); second, that the court abused its discretion when it denied their motion for leave to amend their complaint; and finally, that it abused its discretion by denying their motion under Rule 59(e) to reconsider its dismissal. Notably, the plaintiffs have not urged us directly to review the district court's assessment of the legal sufficiency of their complaint, and so we do not have any issue before us that we review *de novo* and we need not again consider the standards for pleading a securities fraud case. Instead, each of the rulings before us is one that lies within the district court's discretion, and our review is deferential. With that in mind, we conclude that the district court did not abuse its discretion, and we therefore affirm its judgment.

**I**

Because factual detail is so important in PSLRA cases, we begin with an overview of the underlying events. We present the alleged facts in the light most favorable to the putative class, without vouching for them otherwise. Guidant is a multinational corporation that develops, manufactures, and markets medical devices. Among those devices are implantable cardioverter defibrillators ("ICDs") and pacemakers that are used to monitor the heart and to deliver electricity to treat cardiac abnormalities. The plaintiffs represent a putative class (that was never certified) of investors who purchased Guidant stock between December 1, 2004, and October 18, 2005.

Beginning in 1994, Guidant launched the "Ventak" line of ICDs. In February 2002, Guidant discovered a design flaw in one model, the Ventak Prizm 2 DR, after it received some reports of device failures. By April 2002, it had addressed those flaws and begun producing a corrected version of the device. But it did not recall the defective products. Instead, it continued selling its inventory of defective units without disclosing either to physicians or the public the design flaw or malfunctions that had led to device failures. Guidant was aware of at least 25 reports of device short-circuiting in the older units in circulation.

Two years after Guidant redesigned the Prizm 2 DR, in the spring and summer of 2004, it entered into negotiations with Johnson & Johnson ("J&J") for a possible merger. The two companies executed a confidentiality agreement as part of those early discussions. On December 1, 2004

(the first day of the class period), Guidant issued a press release containing "highly positive news" about growth prospects for its ICD and pacemaker businesses. The release expressed Guidant's confidence about the continued worldwide growth of that market and Guidant's expected performance in it. This press release, the plaintiffs assert, was false and misleading, because Guidant knew at the time that there were unresolved liability issues related to the defects in its devices, but the release was silent about this problem. In the week following the issuance of the December 1 press release, Guidant's share price rose more than $5, from about $65 to around $70.

An announcement of a merger agreement between Guidant and J&J followed soon afterwards, on December 15, 2004. The second release stated that J&J was to acquire Guidant for approximately $25 billion in cash and stock; this reflected an imputed price of $76 per share for Guidant's stock. The December 15 release touted the strength of the worldwide market for cardiovascular products. Guidant and J&J filed that release with the Securities and Exchange Commission ("SEC"), as a Form 8-K. According to the plaintiffs, Guidant's share price had jumped from $65 to $75 in anticipation of the merger announcement. This second release, however, was also silent about the liability risks that Guidant faced from its defective products.

On three occasions—December 21, 2004, January 7, 2005, and January 19, 2005—Guidant filed Form 425s with the SEC to provide updated information to investors about

the J&J merger. Those updates were just as silent as everything else had been about the problems with Guidant's ICDs. Between the end of January 2005 and March 13, 2005, Guidant issued other statements about the company's performance and the merger. These statements too said nothing about the liability risks it faced.

Sadly, those risks were realized when, on March 13, 2005, 21-year-old Joshua Oukrop died after his Ventak Prizm 2 DR short-circuited. Guidant learned of Oukrop's death three days later, on March 16. It acknowledged to Oukrop's physician, Dr. Barry Marron, that the ICD had short-circuited and that it knew of 25 other such cases. It also told Dr. Marron that approximately 24,000 ICDs similar to the one implanted in Oukrop had been sold. When Dr. Marron asked Guidant whether the other recipients would be told of the defect, Guidant said no, it did not want to "alarm" anyone.

True to its word, when Guidant filed a preliminary proxy statement with the SEC on March 24, 2005, it said nothing about the fact that one patient had recently died as a result of the malfunction of its product. The same omissions occurred in other SEC filings and Guidant press releases from March to July 2005. On April 27, 2005, Guidant's shareholders approved the sale to J&J at a price of $76 per share. Not until May 23, 2005, did Guidant disclose in a letter to physicians that there were reported problems with its ICD and pacemaker devices. That action was prompted by an article that the *New York Times* was about to publish, revealing the full story of the flaws. Guidant's May 23 letter informed the doctors that

it had learned of the defects in 2002, had fixed them in later devices, and did not recommend replacement of the defective devices because of the low risk of failure and the risk attendant to additional surgery. On May 25, 2005, Guidant issued a press release to the same effect.

The Food and Drug Administration ("FDA") issued a national recall for the Guidant devices on June 17, 2005. Guidant issued a physician communication and a press release on the same day. That press release disclosed that there had been 15 reports of failure in the Contak Renewal and Contak Renewal 2 defibrillators, out of approximately 16,000 implanted worldwide, and two memory error incidents among its four models of AVT defibrillators, out of about 21,000 implanted worldwide. After the FDA-ordered recall, Guidant's share price dropped $3.36 immediately, falling to $70.33. That alone represented a loss of $1.09 billion to Guidant investors. Further press statements downplaying the significance of the defects followed in June and July, while Guidant's share price dropped another $2.10. In October 2005, J&J announced that it was reconsidering the merger; this announcement also hit Guidant's share price hard, dropping it in one day from $72.38 to $64.10. J&J began renegotiating the terms of the merger, but eventually another company, Boston Scientific, entered the bidding as well, and the latter firm ultimately agreed to buy Guidant for about $80 per share. That deal was finalized on April 21, 2006. Guidant became and still is a wholly owned subsidiary of Boston Scientific.

## II

In the wake of the fluctuations in Guidant's share price, which, over the class period, went from a low of about $63 up to the high of $80 paid by Boston Scientific, four class action suits were filed between June and August 2005 in the Southern District of Indiana (where Guidant is headquartered) against Guidant and eleven of its senior officers and directors.[1] (We refer to the defendants collectively as Guidant.) These suits all alleged that Guidant had made false statements in the J&J merger documents, and in other press releases and SEC filings. This group of complaints was voluntarily dismissed without prejudice in September and October 2005.

From November 3, 2005, through January 3, 2006, a second set of securities class actions was filed in the same district court. On March 16, 2006, the district court consolidated these cases, and on June 2, 2006, lead counsel for the plaintiffs filed a consolidated complaint. The consolidated complaint alleged that during the

---

[1] The individual defendants were various officers and directors, including Ronald W. Dollens, Guido J. Neels, Keith E. Brauer, Beverly H. Lorell, Roger Marchetti, Ronald N. Spaulding, R. Frederick McCoy, Jr., James M. Cornelius, John B. King, William F. McConnell, Jr., and Kathleen Lundberg. Guidant points out that neither the proposed amended complaint nor the Notice of Appeal names King, Marchetti, McConnell, or Spaulding. Given our disposition of the appeal as a whole, their omission is of no consequence. It is reasonable to assume, however, that plaintiffs have acquiesced in the district court's judgment insofar as it applies to these four people.

class period, Guidant and the individual defendants had made materially false and misleading statements and had omitted material information relating to the safety of Guidant's defibrillators and pacemakers and to the proposed J&J merger. The plaintiffs asserted that when the true facts were disclosed, Guidant's stock price plummeted, losing approximately $3 billion in value. Yet, the plaintiffs continued, the individual officers and directors of Guidant sold nearly $114 million in Guidant stock during the class period, and the approval of the J&J merger caused their stock options to vest.

Five days after the consolidated complaint was filed, the district court allowed the plaintiffs to substitute a corrected version of the complaint. The corrections were not entirely technical; most importantly, they pushed back the start of the class period from December 15, 2004, to December 1, 2004. On June 13, 2006, the plaintiffs filed supplemental information about Guidant's defibrillators that had just become available to them as a result of a Texas court's decision to unseal documents in a products liability case concerning the same issues. This submission was presented in support of a motion to lift a stay of discovery; the district court eventually denied that motion. Then on August 15, 2006, Guidant filed a motion to dismiss for failure to state a claim. Over the next year, while the court had that motion under advisement, the plaintiffs notified the court that additional information relating to scienter had surfaced in another products liability case against Guidant that was pending in Minnesota.

On February 27, 2008, the district court granted Guidant's motion to dismiss. After setting forth the history of the case, the court turned its attention to the plaintiffs' motion to strike various materials that Guidant had submitted. The court refused to strike Guidant's annual report for fiscal year 2005, which was reported on its SEC Form 10-K; it also refused to strike seven of Guidant's SEC Form 8-Ks; finally, it ruled that six exhibits reflecting physician communications and press releases were not admissible for their truth, but were admissible for the limited purpose of showing what statements were made by Guidant to the public. The plaintiffs have not complained about any of these rulings on appeal.

Turning to the merits of Guidant's motion, the court noted that the complaint raised claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), as well as SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This meant, the court held, that the PSLRA's pleading standards applied to the complaint. See 15 U.S.C. § 78u-4(b). It acknowledged that the PSLRA imposes a heightened pleading standard for plaintiffs (like these) who are alleging securities fraud. After a careful analysis of each statement in the consolidated complaint, the court concluded that the complaint failed to plead with the requisite particularity that Guidant's statements were misleading, and it failed to plead particularized facts giving rise to the necessary strong inference of scienter. In addition, the court expressed strong doubt about the lead plaintiffs' standing to allege § 10(b) claims based on alleged misstatements or omissions that occurred after their final purchases of Guidant stock

(which took place on December 17, 2004). But the court was willing to assume that the plaintiffs could amend to join an additional later-purchasing named representative, and so it did not rely on this as a ground for its decision. The court's judgment, which was docketed on February 27, 2008, dismissed the case with prejudice.

On March 13, 2008, the plaintiffs filed a motion under FED. R. CIV. P. 59(e), in which they asked the district court to set aside the judgment and to permit them to file an amended complaint. (Initially there was some confusion about the timeliness of this motion, but the district court ultimately recognized that it was timely.) The proposed amendment made more specific allegations about the particular statements that were misleading and about scienter, and it added allegations based on the new material from the Minnesota litigation. On May 9, 2008, the district court denied the motion, holding that the plaintiffs had not been diligent in obtaining and presenting facts based on the Minnesota materials. The court did not offer any analysis of the adequacy of the proposed amended complaint, nor did it address the criteria of Rule 15(a) for granting leave to amend.

**III**

Those rulings set the stage for this appeal. As we noted earlier, the plaintiffs do not assert that the district court's assessment of the consolidated complaint was in error. We therefore have no need to delve into the niceties of pleading a securities fraud case. See generally *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321 (2007).

Instead, we must address three more limited questions: first, whether the district court abused its discretion by dismissing the consolidated complaint with prejudice; second, whether the court abused its discretion in denying the plaintiffs' motion to vacate the judgment pursuant to Rule 59(e); and finally, whether it abused its discretion when it denied the plaintiffs' motion to file an amended complaint.

A

If one were to read the plaintiffs' brief in isolation, she would be left with the impression that the district court looked at only one complaint and peremptorily dismissed it without any further thought. Superficially, perhaps that is close to the truth (although even that overlooks the immediate correction that the plaintiffs made to the consolidated complaint a few days after it was filed). But, as Guidant points out, the full story is more complex. Before the cases were consolidated, nine individual complaints had been filed based on the identical underlying events. The district court, from the time the first complaint was filed, gave the plaintiffs about a year to review and investigate the case, and then to file a consolidated complaint. That is what they did. The court also allowed the corrected filing. Later, while Guidant's motion to dismiss was under advisement, the plaintiffs twice notified the court about additional information they had acquired (from the Texas and Minnesota cases), but they did not at the same time proffer an amended complaint. Thus, even disregarding the fact that the individual suits over these issues began as early as June 2005, we

know that the consolidated complaint was filed on June 2, 2006, and that the district court's order of dismissal was entered on February 27, 2008.

We see no way in which that sequence could be branded as an abuse of the district court's discretion. It is true that there are some cases in which courts of appeals have found that it is best to use a dismissal without prejudice for a PSLRA complaint, given the demanding nature of PSLRA pleading standards. See, *e.g.*, *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006) (a PSLRA "complaint that omits certain essential facts and thus fails to state a claim warrants dismissal pursuant to Rule 12(b)(6) but not dismissal with prejudice"); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2002) (dismissal with prejudice in PSLRA suit is appropriate only where "it is clear on *de novo* review that the complaint could not be saved by amendment"). But by the same token, there are other cases in which courts of appeals have upheld dismissals with prejudice of securities complaints at a relatively early stage. See, *e.g.*, *Pugh v. Tribune Co.*, 521 F.3d 686, 698 (7th Cir. 2008) (dismissal of second amended complaint); *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390-91 (4th Cir. 2005); *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d 137, 153-54 (3d Cir. 2004) (initial individual complaints folded into one consolidated complaint, which was then dismissed with prejudice without an opportunity to amend).

This tells us that each case must be evaluated on its own merit, in light of its own procedural history. The district court was entitled to view this case as one in

which the plaintiffs had, as a practical matter, a number of opportunities to craft a complaint that complied with the standards of the PSLRA. It was therefore entitled to bring this litigation to a close with a dismissal with prejudice.

B

We consider next the plaintiffs' argument that the district court abused its discretion when it denied their motion for reconsideration under FED. R. CIV. P. 59(e). We do so because we have held that, once a final judgment has been entered, the normal right to amend once as a matter of course under FED. R. CIV. P. 15(a) is extinguished. See *Foster v. DeLuca,* 545 F.3d 582, 584 (7th Cir. 2008); *Paganis v. Blonstein,* 3 F.3d 1067, 1072-73 (7th Cir. 1993). What the aggrieved party must do, instead, is to file a motion under Rule 59(e) seeking relief from the judgment, and, if it believes that the deficiencies the court has identified can be cured through an amended complaint, it must proffer that document to the court in support of its motion. See *Hecker v. Deere & Co.,* 556 F.3d 575, 590-91 (7th Cir. 2009). Even if the party does this, it has a hard row to hoe, because normally Rule 59(e) motions may not be used to cure defects that could have been addressed earlier. The party must instead point either to an error of law or to newly discovered evidence. See *Sigsworth v. City of Aurora,* 487 F.3d 506, 511-12 (7th Cir. 2007).

The plaintiffs here assert that the information that came into their hands after the records in Texas and Minnesota were unsealed qualifies as newly discovered evidence,

and thus that the district court abused its discretion when it refused to reopen the judgment. They urge that they acted diligently to obtain those facts, but that they were stymied, in part because the district court refused to lift a stay of discovery that it had imposed pursuant to the PSLRA. Once the documents were released, it took the plaintiffs four months to review them and then to amend their consolidated complaint. In the plaintiffs' view, "[w]hile perhaps less than perfect, this delay was not such a want of diligence that it should permanently bar a billion-dollar securities case."

We are not prepared to say that the district court's decision on this matter was compelled in one direction or the other—by which we mean that had the district court chosen to grant the Rule 59(e) motion, it is likely that such a ruling would also have fallen within the scope of the court's discretion. But by the same token, we cannot find that the court's decision to deny the motion was abusive. In assessing the importance of the new evidence, the court necessarily took a peek at how the proposed amended complaint would have addressed the deficiencies it had identified. And, after taking this look, the court was still of the opinion that it could not tell "precisely what facts were allegedly omitted from [Guidant's] disclosures that — in Plaintiffs' assessment — would have more fully and truthfully informed the investing public about Guidant product defects." The court also continued to believe the plaintiffs had fallen short of their responsibility to plead scienter and that they had not cited "any internal documents, confidential witnesses, or other sources to support their allegations . . . ."

The plaintiffs argue, however, that the district court's approach to the Rule 59(e) motion was inconsistent with two recent decisions from this court, *Chaudhry v. Nucor Steel-Indiana,* 546 F.3d 832 (7th Cir. 2008), and *Foster,* 545 F.3d 582. We find *Chaudhry* to be readily distinguishable, because it involved a situation in which the district court refused to construe a motion under Rule 15(a) as a motion under Rule 59(e) or Rule 60. This court found that the district court was being "hyper-technical" with the label on the top of the page and instructed the court to evaluate the motion on the merits. *Chaudhry,* 546 F.3d at 839. This case suffers from no such problem. *Foster* would present a more difficult problem if this case, like *Foster,* was a simple one in which the first action of the district court was to grant a motion to dismiss on the pleadings with prejudice, without any determination about the sufficiency of a proffered amended complaint. See *Foster,* 545 F.3d at 584-85. But, as we have explained, this is not a simple case of a single complaint that is tossed out of court without explanation.

The district court was also entitled to take into account the fact that the plaintiffs here apparently made a strategic decision not to put their new evidence into the record before the court ruled on Guidant's motion to dismiss. As we noted in *Sigsworth,* "it is well-settled that a Rule 59(e) motion is not properly utilized to advance arguments or theories that could and should have been made before the district court rendered a judgment . . . ." 487 F.3d at 512 (internal quotation marks omitted). For all these reasons, we find no abuse of discretion in the district court's decision to deny the plaintiffs' Rule 59(e) motion.

C

Our discussion of the Rule 59(e) motion resolves, for the most part, the plaintiffs' argument with respect to their motion to amend. Although the plaintiffs urge that the district court should have evaluated their motion to reopen the judgment under the standards outlined in Rule 15(a) (that is, the court should have assumed that they had a right to amend as a matter of course), rather than under the Rule 59(e) standards, that position does not reflect the proper relation between those two rules. Interestingly, that position is also inconsistent with what the plaintiffs themselves said before the district court. As Guidant points out, there the plaintiffs stressed that their initial request was to amend the judgment under Rule 59(e) to make it one without prejudice, and they referred to Rule 15(a) only after asserting that they had met the requirements of Rule 59(e). Citing *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005), Guidant takes the position that the plaintiffs have therefore waived any argument that Rule 15(a) standards somehow take precedence.

We prefer not to concern ourselves with waiver, as it makes no difference to the outcome. The entry of a final judgment under Rule 58 is a watershed point in any litigation. Rule 15(a) is silent about any period after final judgment. But there are two rules of civil procedure that expressly address this phase of the suit: Rule 59 and Rule 60. Those rules logically affect all the rest of the rules directed to proceedings in the district courts. The district court correctly assessed whether the plaintiffs were entitled under the standards of Rule 59(e) to have

the judgment altered or amended. As we said in *Hecker,* "[o]nce judgment has been entered, there is a presumption that the case is finished, and the burden is on the party who wants to upset that judgment to show the court that there is good reason to set it aside." 556 F.3d at 591. The plaintiffs here did not meet that burden.

* * *

We AFFIRM the judgment of the district court.