**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1672**

───────────

MAAN ALJIZZANI,

　　　　　Plaintiff - Appellant,

　　v.

MIDDLE EAST BROADCASTING NETWORKS, INC.,

　　　　　Defendant - Appellee.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Rossie David Alston, Jr., District Judge.  (1:22-cv-01321-RDA-WEF)

───────────

**No. 25-1333**

───────────

STEVEN ISAAC,

　　　　　Plaintiff - Appellant,

　　v.

MIDDLE EAST BROADCASTING NETWORKS, INC.,

　　　　　Defendant - Appellee.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:24-cv-01208-LMB-WEF)

───────────

Argued:  March 19, 2026　　　　　　　　　　　　Decided:  June 17, 2026

Before NIEMEYER, QUATTLEBAUM, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Quattlebaum and Judge Rushing joined.

**ARGUED:** Dirk Harris McClanahan, MCCLANAHAN POWERS, PLLC, Falls Church, Virginia, for Appellants. Andrew W. Bagley, Jillian Ambrose, CROWELL & MORING LLP, Washington, D.C., for Appellee. **ON BRIEF:** Rachel Lesser, CROWELL & MORING LLP, Washington, D.C., for Appellee.

NIEMEYER, Circuit Judge:

Maan Aljizzani and Steven Isaac were journalists employed by Middle East Broadcasting Networks, Inc. ("MBN"), a Virginia-based corporation that operates Alhurra TV, an Arabic-language satellite television station, as well as digital media networks, which broadcast news and current events to audiences in the Middle East and North Africa. Notwithstanding MBN's mandatory Code of Ethics and social media policy, which required its journalists to remain neutral both when reporting and when posting personally, Aljizzani and Isaac violated the Code and policy, despite individualized orders directing them not to do so, and MBN then terminated their employment. With the same counsel, they commenced separate but similar actions against MBN, alleging that it discriminated against them on the basis of their Iraqi national origin, in violation of Title VII of the Civil Rights Act of 1964. The district court in each action granted MBN's motion to dismiss, concluding that both plaintiffs' complaints failed to allege facts that were sufficient to state a plausible claim for discrimination based on national origin.

After carefully reviewing the plaintiffs' complaints de novo, we agree and affirm the district courts' judgments.

I

A

In his amended complaint, Maan Aljizzani alleged that he was employed by MBN as an investigative journalist for Alhurra TV, which broadcasts in the Arabic language to audiences in the Middle East, among other places. Aljizzani alleged that "[a]ll MBN

3

journalists are required to abide by MBN's Journalistic Code of Ethics," a copy of which he attached to his complaint.

The Code of Ethics regulates the journalists' professional conduct, such as how to ethically investigate cases and interview individuals, as well as aspects of their personal conduct, *including what they post on their personal social media accounts*. It states, "MBN's Journalists should not insert their personal opinions in any report on any platform at any time and should not provide Commentary," and they "shall maintain the highest ethical standards in all conduct," including remaining "free of associations, activities or conduct that could, or could appear to, compromise their integrity, damage their credibility or jeopardize their journalistic independence." The Code also requires journalists to "adhere to the letter and spirit of MBN's social media requirements," which are set forth in a social media policy that is part of the Code. The social media policy explains that "[w]hen online, all MBN Journalists are representatives of MBN and should always be mindful of how their words and links reflect on MBN" and that the "Code of Ethics applies to *all personal social media accounts*." (Emphasis added). The policy warns journalists that they "are responsible for everything appearing on their personal social media pages; inflammatory or otherwise inappropriate material from third parties must be deleted immediately"; and "[v]iolations of this policy may result in disciplinary action, up to and including termination of employment."

On March 6, 2021, when Pope Francis visited and met with the Grand Ayatollah Ali al-Sistani in Najaf, Iraq, Aljizzani tweeted:

4

> [T]he owner of the house [apparently referring to the Grand Ayatollah] was an emaciated ghost, expressionless and emotionless, as if he were sitting upright in spite [of] his aged body, amid the amazement, astonishment, and pity of the guest [apparently the Pope]!

That same day, MBN's Vice President of Programing, who was also Aljizzani's supervisor, "told him to delete his tweet." Aljizzani admitted, however, that because his supervisor did not provide a reason, Aljizzani "did not delete the tweet." MBN then suspended him. Three days later, when Aljizzani still had not deleted the tweet, explaining that "he would not delete the tweet because he did not understand what was wrong with its content," MBN terminated his employment.

Based on these facts, Aljizzani alleged in his complaint that the Code of Ethics and social media policy were enforced unevenly, as non-Iraqi journalists rarely, if ever, received reprimands for violating the Code, and therefore that he had been discriminated against because he was Iraqi. And while he alleged that MBN's responses to Code violations by others were less severe, he did not allege the substance of those other purported Code violations, let alone allege that others disobeyed a direct order to comply with the Code. Nonetheless, he alleged that MBN deprived him of "equal employment opportunities, and otherwise adversely affected his status as an employee on the basis of [his] national origin, in violation of 42 U.S.C. § 2000e-2(a)(1)."

The district court granted MBN's motion to dismiss the complaint for failure to allege a plausible claim for relief. The court concluded that Aljizzani had neither "allege[d] direct evidence of discrimination" nor "allege[d] facts that sufficiently support[ed] an inference that his termination was based on national origin discrimination." Understanding

5

that Aljizzani sought to prove discrimination by comparing his treatment with the treatment of others, the court noted that Aljizzani "[did] not allege that the other Iraqi Journalists were similarly terminated for refusing to comply with their supervisors' instruction," such that "he ha[d] not adequately alleged facts that he was treated differently than similarly situated employees outside of his protected class."

From the district court's order dated June 20, 2024, dismissing his complaint, Aljizzani filed this appeal.

B

In his amended complaint, Steven Isaac alleged that he too was employed as a journalist — "a correspondent" — by MBN. And he too alleged that "all MBN Journalists are required to abide by MBN's Journalistic Code of Ethics," a copy of which he also attached to his complaint.

Issac's complaint alleged that, in the beginning of March 2021, which was a period of unrest in Iraq, "MBN gave multiple Iraqi Journalists verbal warnings to stop posting any political content about Iraq on their personal social media accounts," and that Isaac was one of the employees who was given the warning. Nonetheless, Isaac thereafter made at least four postings on his social media account containing political content about Iraq, in violation of not only the Code of Ethics but also in rejection of the warning given to him. Specifically, in an undated tweet, he posted:*

The speech of Qais last night greatly provoked [Muqtada] Al-Sadr.

---

* The complaint included these certified English translations of the tweets, which were posted in Arabic, and the translations contained the brackets as shown.

6

Qais could have "bit his tongue" to calm things down, but it seems he couldn't miss the opportunity to stick it to him and come out looking like "the cousin who's smarter than you at school."

On August 28, 2022, he posted:

Is Saad Kambash wanted by the judiciary or are we mistaken?
You Sunni members of parliament Talal Al-Zobaie and Khaled Al-Obaidi and Defense Minister Juma Inad, how could you be present with him?
Didn't you ask him how the funds of the Sunni Endowment, which are the funds of the [Sunni] component, ended up being used to purchase a hotel in Erbil?

On August 29, 2022, he posted:

[Grand Ayatollah] Al-Haeri has spilled the blood of many innocent Iraqis through his criminal fatwas (which are available and compiled in the book "Guide for the Mujahid").

Stick with your Iraqi leader and the most noble city of Najaf. The Iranian Al-Haeri, who wants you to follow Tehran and become chess pieces of Khamenei, is of no avail to you.

Finally, later on the same date, he posted:

The confidant of the faction leaders calls for "amputating the afflicted part."
This is what incitement to bloodshed and killing looks like.
For the record, he takes his money and salary from the country's money, while graduates can't even find a job.
Then the [Coordination] Framework [leaders] ask, why don't people sympathize with us?

With that particular post, Isaac also included another person's post that conveyed a similar message.

Less than a week after Isaac posted these comments, as the complaint alleged, William Sbatini, an advisor to MBN's President, and Mohammed Bardawill, MBN's Head of the News, advised Isaac that MBN was terminating his employment. The complaint stated, "The alleged basis was due to a tweet in violation of MBN's social media policy."

7

Based on these facts, Isaac alleged that the Code of Ethics and social media policy were enforced unevenly and more leniently for non-Iraqi journalists, such that discrimination against Iraqi journalists could be inferred. The complaint then described numerous comparators but alleged "specifically [that] the most comparable would be Khalil Bin Tawila," an Algerian who had "appeared with his title in a TV Interview with a Radical Anti-government Chinese network and called for regime change. He was suspended for two weeks and not let go." But the complaint made no allegation that Tawila had been given a prior warning that he disobeyed, nor did it explain how circumstances in China were analogous to those in Iraq, where MBN was actually broadcasting. The complaint described other less similar comparators, again never alleging that any had disobeyed an order or warning or even that the comparator had posted about Iraqi politics.

The district court granted MBN's motion to dismiss Isaac's amended complaint for failure to allege a plausible claim for relief. The court referenced its prior ruling granting MBN's motion to dismiss Isaac's initial complaint, in which it had observed that this case was "pretty much almost the same case against the same defendant representing a different journalist [Aljizzani] from the entity also of Iraqi background," which a different district judge had already dismissed. The court concluded that Isaac's complaint was likewise deficient because it did not "adequately and more specifically [allege] appropriate comparators that would allow the case to go forward" and therefore "the complaint is really not sufficient," especially when the allegations of discrimination were "based solely on comparators."

From the district court's order dated March 7, 2025, Isaac filed this appeal.

8

II

To survive a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must "allege facts sufficient to state all the elements of [his] claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). In reviewing such a motion, a court must "focus on the pleading requirements under the Federal Rules rather than the proof ultimately required to succeed on the claim." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). And Rule 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). But a plaintiff cannot rely on "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* Rather, a complaint must "'contain sufficient *factual matter*, accepted as true, to state a claim to relief that is plausible on its face' in the sense that the complaint's *factual allegations* must allow a 'court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (emphasis added) (cleaned up) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Our review is de novo. *See Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023).

As relevant here, each plaintiff, in order to state a plausible Title VII discrimination claim, was "required to allege facts to satisfy the elements of a cause of action created by that statute," *McCleary-Evans*, 780 F.3d at 585 — here, that MBN "discharge[d]" him "*because of* . . . national origin," 42 U.S.C. § 2000e-2(a)(1) (emphasis added).

9

While both plaintiffs alleged an adverse action — that MBN terminated their employment — they failed nonetheless to allege facts sufficient for a court to infer that their termination was *because of* their national origin rather than their insubordination with respect to MBN's Code and social media policy. We address each complaint in turn.

A

In his complaint, Aljizzani alleged that he was subject to MBN's Code of Ethics and social media policy, which limited what its journalists could post on their social media accounts. He also acknowledged that MBN could terminate employees for violations of the Code and policy.

As to his termination, the complaint alleged that Aljizzani made a social media post on March 6, 2021, apparently critiquing the Grand Ayatollah in Iraq as he was meeting with Pope Francis. Aljizzani's supervisor immediately called him "and told him to delete his tweet." When Aljizzani refused to delete the tweet, MBN suspended him. Three days later, when he still had not deleted the tweet, MBN convened a meeting between Aljizzani and two corporate executives, and Aljizzani again refused to remove the tweet. At that point, MBN terminated him "for violating [its] Code," as the complaint alleged. In short, the complaint alleged that Aljizzani was terminated for insubordination.

To be sure, Aljizzani argues that, although he was terminated for insubordination, his firing was nonetheless discriminatory because he was treated differently from non-Iraqi employees. But the complaint did not identify a single non-Iraqi employee who engaged in similar conduct — *i.e.*, who made a social media post about Iraqi politics, in violation

10

of MBN's Code of Ethics and social media policy, and who subsequently defied MBN's direct order to remove the offending post — and who was not likewise terminated.  Rather, the complaint alleged only that two non-Iraqi employees, Randa Jebai and Ghalia Bdewi, "regularly post[ed] on social media" and "have never received reprimands for violating MBN's Code" and that three other non-Iraqi employees, Pedro Ghanem, Joe Khawly, and Tamara Abou Dehen, "frequently tweet[ed] political opinions that should constitute violations" of the Code but have not been reprimanded.  Such highly generalized comparisons based simply on allegations that other individuals posted on social media without reprimand lack the particularity necessary to permit a court to "draw the reasonable inference" that Aljizzani was terminated because of his national origin rather than his conduct.  *McCleary-Evans*, 780 F.3d at 585 (cleaned up).  Without any suggestion that any other employee engaged in the same conduct and was not terminated, an inference of discrimination is unwarranted and implausible, particularly "in light of the 'obvious alternative explanation'" that Aljizzani was fired for insubordination.  *Id*. at 588 (quoting *Iqbal*, 556 U.S. at 682); *see also Kelley v. United Parcel Serv., Inc.*, 528 F. App'x 285, 286–87 (4th Cir. 2013) (per curiam).

For these reasons, we affirm the district court's order dismissing Aljizzani's complaint for failure to state a claim of Title VII discrimination.

11

B

Isaac's complaint falls short for the same reason. He too alleged that he was subject to MBN's Code of Ethics and social media policy, which regulated his activity on personal social media accounts and allowed MBN to terminate employees for violations.

As for his circumstances, he alleged that in March 2021, MBN sent him a "verbal warning[] to stop posting any political content about Iraq on [his] personal social media accounts." But, notwithstanding this warning, the complaint described how he posted at least four tweets about Iraqi politics. He acknowledged in his complaint that less than one week later, MBN terminated his employment "due to a tweet in violation of MBN's social media policy." Thus, like Aljizzani's, Isaac's complaint alleged that his employment was terminated for repeated insubordination and violation of the Code and social media policy.

Like Aljizzani's, Isaac's main argument for alleging discrimination again rests on facts in the complaint alleging that he was treated less favorably than non-Iraqi employees. In particular, he points to the allegations that Jebai and Bdewi "regularly posted similar content to the Iraqi journalists on social media" without reprimand; that Ghanem, Khawly, and Dehen "frequently tweeted their political opinions without reprimand"; and that a sixth employee, Tawila, discussed Chinese politics on television but was only suspended. (Cleaned up). But here, too, Isaac's complaint provided insufficient detail from which to conclude that the comparators' circumstances were sufficiently similar to his so as to give rise to a reasonable inference that Isaac was terminated because of his national origin rather than his repeated policy violations. *See, e.g.*, *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 749 (4th Cir. 2017) (per curiam); *Squire v. Identity, Inc.*, No. 21-2410, 2022

12

WL 17038958, at *2 (4th Cir. Nov. 17, 2022) (cleaned up) ("The inferential gap is especially yawning when an obvious alternative explanation could explain [the employer's] decision"); *McCleary-Evans*, 780 F.3d at 588 (similar).

For these reasons, we also affirm the district court's order dismissing Isaac's complaint for failure to state a claim of Title VII discrimination.

\*　　\*　　\*

Aljizzani and Isaac alleged detailed facts demonstrating that MBN terminated their employment only after each had violated a company policy and had been warned or ordered to comply. Aljizzani's complaint alleged that he twice refused orders to remove a social media post that MBN had concluded violated its Code of Ethics and social media policy. And Isaac's complaint alleged that he violated MBN's social media policy at least four times, in direct violation of a warning not to post about Iraqi politics. Neither complaint alleged facts that could give rise to a plausible inference of discrimination. Thus, both complaints "stopped short of the line between possibility and plausibility of entitlement to relief." *McCleary-Evans*, 780 F.3d at 586 (cleaned up). Without more, a court could "only speculate" that the plaintiffs were terminated because of their national origin rather than on account of their admitted policy violations and insubordination. *Id.* We therefore affirm the judgments in both cases.

III

Aljizzani also argues that the district court abused its discretion in dismissing his amended complaint with prejudice, thus precluding him from amending it for a second time. We cannot agree, however, as he never requested leave to amend it.

To be sure, Federal Rule of Civil Procedure 15 instructs district courts to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). And "[t]he law is well settled 'that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (emphasis omitted) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)). But "[r]egardless of the merits of the desired amendment, a district court does not abuse its discretion by declining to grant a motion that was never properly made." *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014) (cleaned up); *see also Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008) (same); *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 305 n.6 (4th Cir. 2017).

Moreover, in this case, it would appear that any further amendment would be "futile in light of the fundamental deficiencies in [Aljizzani's] theory of liability." *Cozzarelli*, 549 F.3d at 630. By Aljizzani's representation, if given leave to amend, he would provide "detailed descriptions of the various jobs of comparators and exact [social media] postings

14

for comparison." But additional information regarding non-Iraqi employees' social media posts that Aljizzani does not claim were about Iraqi politics would not move the needle, especially in the absence of a proffer that he could also allege that those non-Iraqi employees had been similarly insubordinate.

*      *      *

The judgments entered on June 20, 2024 (in No. 24-1672) and March 7, 2025 (in No. 25-1333) are accordingly

AFFIRMED.